

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. **13 CR 695** |
| | ) | |
| v. | ) | |
| | ) | Violations: Title 18, United States Code, |
| RUSSELL S. OTT, | ) | Section 1344; and Title 26, |
| BRIAN MCMAHON, | ) | United States Code, Sections |
| ANDREW W. STACY, | ) | 7201, 7203, 7206(1), and 7206(2) |
| SCOTT F. DARVILLE, | ) | **JUDGE CHANG** |
| F. PETER MIGNIN, | ) | |
| KEVIN D. HANSON, | ) | |
| OWEN A. WEICHEL, | ) | **MAGISTRATE JUDGE MARTIN** |
| JOHN MATERYN, | ) | |
| JILL A. PLUTA, | ) | **FILED** |
| aka JILL OTT, and | ) | |
| JOAN M. QUICK | ) | AUG 2 8 2013 |

**COUNT ONE**

THOMAS G. BRUTON
CLERK, U S DISTRICT COURT

THE SPECIAL MARCH 2013 GRAND JURY charges:

1.      At times material to this indictment:

**The Defendants**

(a)     Defendant RUSSELL S. OTT was a resident of Elburn, Illinois, and the owner

and operator of Emily, Inc., doing business as Pro Source Motorsports, a corporation located in

Morris, Illinois. Between approximately April 1995 and October 2008, Pro Source was engaged in

the business of selling new and used motorcycles, luxury motor homes and recreational vehicles, all

terrain vehicles, boats, and jet skis. During 2007 and 2008 OTT also had ownership interests in

Liberty Cycle, a motorcycle dealership in Libertyville, Illinois, and Huntley Chevrolet, an automobile

dealership located in Huntley, Illinois.

(b)     Defendant BRIAN MCMAHON was a resident of Naperville, Illinois, and a

Certified Public Accountant who owned and operated a motorcycle dealership called Naperville

Triumph Suzuki from approximately 2001 through 2004, when he sold it to OTT. MCMAHON acted

as OTT and Emily, Inc.'s outside accountant and prepared the financial statements for Emily, Inc. from approximately 2000 through 2008, the United States Income Tax Returns for Emily, Inc. for at least the years 2004, 2005, and 2006, and the United States Individual Income Tax Returns for OTT for at least the years 2004, 2005, and 2006. In order to prepare these financial statements and tax returns, MCMAHON had access to and was familiar with the financial and accounting records of OTT and Emily, Inc., including Emily, Inc.'s QuickBooks and bank records.

(c) Defendant ANDREW W. STACY was a resident of Elburn, Illinois, and worked for OTT as a parts manager at Pro Source between approximately 1998 and 2000. In late 2005 STACY acquired TUF Powersports, a motorcycle dealership located in DeKalb, Illinois, with financial assistance from OTT, which STACY operated until it closed in late 2008.

(d) Defendant SCOTT F. DARVILLE was a resident of Racine, Wisconsin, and from approximately 1998 to 1999 owned and operated Pro Source of Woodstock, located in Woodstock, Illinois. In approximately June 2000 DARVILLE became the owner of Racine MotorSports, LTD, located in Racine, Wisconsin, which he operated until it closed in approximately August 2009. Racine MotorSports, LTD sold new and used Honda motorcycles.

(e) Defendant F. PETER MIGNIN was a resident of Wayne, Illinois, and the owner and operator of Northwest Investment Company, Inc., doing business as Schaumburg Honda, located in Schaumburg, Illinois. Schaumburg Honda was engaged in the business of selling new and used motorcycles. MIGNIN also owned RPM Management, LLC, doing business as Liberty Cycle in Libertyville, Illinois, a business engaged in selling new and used motorcycles that he agreed to sell to OTT in approximately 2007, and an ownership interest with OTT during 2007 and 2008 in Huntley Chevrolet, an automobile dealership located in Huntley, Illinois.

(f) Defendant KEVIN D. HANSON was a resident of Chicago, Illinois, and the

2

owner and operator of Safety First Racing, LLC, located in Arlington Heights, Illinois. Safety First Racing, LLC, operated a professional motorcycle racing team that competed at events throughout the United States from approximately 2003 through 2008.

(g)     Defendant OWEN A. WEICHEL was a  resident of Huntington Beach, California, a former professional motorcycle racer, and the owner and operator of Center of Gravity, LLC, located in Huntington Beach, California. Center of Gravity, LLC, imported motorcycle parts from Japan and resold them in the United States.

(h)     Defendant JOHN MATERYN was a resident of Brownstown, Michigan, and worked for OTT at Pro Source in approximately 1998. In approximately 2007 MATERYN worked at Liberty Cycle in Libertyville, Illinois, a motorcycle dealership in which OTT and MIGNIN had ownership interests.

(i)     Defendant JILL A. PLUTA, formerly known as JILL OTT, was a resident of LaPorte, Indiana, the former sister-in-law of OTT, and was employed by Pro Source during 2005. From 2005 through 2008 PLUTA worked in the insurance business in sales and marketing positions.

(j)     Defendant JOAN M. QUICK was a resident of St. Charles, Illinois, and the office manager for Pro Source. QUICK was responsible for Pro Source's day-to-day bookkeeping and accounting, including maintaining Pro Source's QuickBooks accounting records and recording Pro Source's banking transactions. QUICK had signature authority over Pro Source's bank accounts, including the business account maintained at Grundy Bank and the payroll account maintained at the Valley Community Bank in St. Charles, Illinois. QUICK was also responsible for Pro Source's payroll functions, including acting as the point of contact for ADP, Pro Source's outside payroll company.

3

**Pro Source's Financing Arrangements With GE Capital Finance and Fifth Third Bank**

(k)     From at least 2000 to May 2007, Pro Source's primary financing arrangement for vehicle sales was with GE Capital Finance through traditional "floor plan loans" whereby GE Capital provided funds directly to the manufacturers of the vehicles on Pro Source's behalf at the time the vehicles were provided to Pro Source for sale to a customer. After receiving payment from GE Capital, the manufacturers provided Pro Source with the vehicle Manufacturer's Statement of Origin, also called an MSO, which was similar to a vehicle title. When Pro Source sold a vehicle and obtained payment from a customer, Pro Source paid off the amount borrowed from GE Capital with interest and kept the profit from the sale, which was generally the difference between the amount charged the customer and the amount owed GE Capital. Pro Source then provided the MSO to the State of Illinois, which issued a vehicle title to the customer.

(l)     In approximately March 2007, OTT applied for five separate lines of credit from Fifth Third Bank to replace GE Capital as Pro Source's primary lender. These five lines of credit were respectively for new RVs, used RVs, new motorcycles, used motorcycles, and other vehicles. In order to be approved, OTT was required to provide Fifth Third Bank with copies of Emily, Inc.'s business tax returns for the years 2004, 2005, and 2006; financial statements supporting the business tax returns; OTT's personal tax returns for the years 2004, 2005, and 2006; and OTT's personal financial statement from February 2007. MCMAHON prepared these documents with OTT's assistance, knowing they were to be submitted to Fifth Third Bank to obtain financing for Pro Source. To maintain and expand the five credit lines, OTT was required to update this financial information on a regular, ongoing basis between May 2007 and September 2008, which he did with MCMAHON's assistance.

(m)     In May 2007, based on the tax and financial information provided by OTT and

4

MCMAHON, which was material to Fifth Third Bank's lending decisions, Fifth Third Bank approved Pro Source's credit applications and issued the five lines of credit. Pro Source initially was approved for a total of $7 million for all five lines of credit. Fifth Third Bank gradually increased the authorized credit limits, and by October 2008 the total credit extended to Pro Source exceeded $31 million.

      (n)    The agreement between Fifth Third Bank and Pro Source provided that the funds from the lines of credit were issued by the bank directly to Pro Source and not to the vehicle manufacturer in what was known as a "direct lending" arrangement. Pro Source was then obligated to pay the manufacturer and obtain the MSO. When Pro Source subsequently sold a vehicle to a customer, Pro Source was obligated to pay Fifth Third Bank over time the borrowed amount with interest and was entitled to keep any profit. Pro Source provided the MSO to the State of Illinois to issue a vehicle title to the customer after a sale.

      (o)    In order to receive an advance on one of the lines of credit from Fifth Third Bank, OTT faxed a "flooring request" form that listed the type of vehicle, the Vehicle Identification Number, and the amount requested to Fifth Third Bank's offices in Cincinnati, Ohio. Based on this documentation, Fifth Third Bank extended funds directly to Pro Source via the lines of credit.

      (p)    In order to ensure that Pro Source was purchasing the vehicles for which it requested draws from the lines of credit and actually had the vehicles in its inventory, Fifth Third Bank utilized the services of Datascan, Inc., an independent company that employed auditors or "floor checkers" to conduct inspections of Pro Source's dealership and inventory approximately every four-to-six weeks in order to verify that the vehicles for which Fifth Third bank extended credit were properly accounted for by Pro Source.

**Pro Source's Financing Arrangements With Other Banks**

(q)     In addition to its floor plan financing relationship with GE Capital and the direct lending relationship with Fifth Third Bank, between approximately January 2003 and October 2008 Pro Source maintained additional financing arrangements with approximately eighteen financial institutions that granted individual loans directly to individual borrowers for the purchase of RVs and other vehicles from Pro Source. These financial institutions included Fifth Third Bank, State Farm Bank, First Midwest Bank, JP Morgan Chase, Horizon Bank, GE Money Bank, Citizens Bank, Wells Fargo Bank, 1st Source Bank, National City Bank, and Commerce Bank, the deposits of which were insured by the Federal Deposit Insurance Corporation; and Hawthorne Credit Union and Tech Credit Union, the deposits of which were insured by the National Credit Union Share Insurance Fund.

(r)     In order to purchase a vehicle from Pro Source through an individual loan, the financial institutions required each potential borrower to furnish a completed loan application, accurate financial information about their income and credit, including copies of tax returns, Form W-2 income and wage statements, financial statements, and proof of insurance. OTT generally prepared and submitted this information to the financial institutions, and the borrower often executed the required loan documents at the loan closings. Each individual borrower generally signed a Loan Application and a Retail Contract or Loan Agreement that stated that the borrower was purchasing an RV from Pro Source and needed a loan for that purpose. After approving the loan, the financial institution disbursed the loan proceeds directly to Pro Source as payment for the vehicle, and the borrower was then obligated to pay the financial institution back directly over time.

(s)     Each individual borrower was advised that the lending financial institution would rely on the borrower's personal credit report, income information, and insurance verification information when deciding whether to approve the loan and enter into the Loan Agreement. Each

6

borrower also was advised that the RV purchased with the loan was pledged as collateral in each

Retail Contract or Loan Agreement. All of these documents were material to the financial

institutions' lending decisions.

### Summary of the Scheme to Defraud

2.      Beginning in about January 2003 and continuing until about October 2008, in the

Northern District of Illinois, Eastern Division, and elsewhere,

> RUSSELL S. OTT,
> BRIAN MCMAHON,
> ANDREW W. STACY,
> SCOTT F. DARVILLE,
> F. PETER MIGNIN,
> KEVIN D. HANSON,
> OWEN A. WEICHEL,
> JOHN MATERYN,
> JILL A. PLUTA,
>     aka JILL OTT, and
> JOAN M. QUICK,

defendants herein, knowingly participated in a scheme to defraud the financial institutions, and to

obtain money owned by and under the custody and control of the financial institutions, by means of

materially false and fraudulent pretenses, representations, promises, and the concealment of material

facts, which scheme is described below.

3.      The purpose of the scheme was to fraudulently obtain money through the extension

of loans and credits from the financial institutions by submitting materially false financial documents

and information to the financial institutions regarding loan applications for RVs and other vehicles

the defendants claimed they were purchasing from Pro Source.

4.      It was part of the scheme that the defendants fraudulently procured the extension of

loans and credits from the financial institutions in an amount exceeding $73.75 million and caused

the financial institutions actual net losses exceeding $56.63 million.

5.      It was further part of the scheme that in order to perpetrate the scheme and to avoid detection, the defendants repaid loans they obtained from financial institutions early in the scheme by fraudulently obtaining later loans from other financial institutions. This permitted the defendants to maintain the false appearance that the overall operation of Pro Source was an economic and financial success resulting in profitable operations and producing large amounts of revenue and substantial income from the sale of expensive RVs and other vehicles, thereby maintaining the apparent creditworthiness of Pro Source and the defendants so as to induce financial institutions that had already made loans to renew, extend, or repeat such loans, and to induce additional financial institutions to lend money to the defendants.

6.      It was further part of the scheme that money and property were obtained for the personal use and benefit of the defendants so as to enable them to maintain lavish lifestyles, operate their businesses, and make investments into other business ventures and entities. This use of money and property created the false appearance of personal wealth and helped induce the financial institutions to advance loans to Pro Source and the defendants more readily, due to their false confidence that the defendants had sufficient personal wealth to repay the loans.

**Manner and Means of the Direct Lending Fraud on Fifth Third Bank**

7.      It was further part of the scheme that OTT and MCMAHON knowingly fabricated false personal and business tax documents and financial statements, and  provided them to Fifth Third Bank on an ongoing basis between March 2007 and October 2008 in order to induce Fifth Third Bank to approve, extend, and increase its lines of credit to Pro Source. OTT and MCMAHON provided Fifth Third Bank with documents and statements that purported to accurately state OTT and

Pro Source's financial and tax condition, when in fact OTT and MCMAHON knew they contained numerous false, fraudulent, and misleading statements and representations that materially overstated the assets and income of OTT and Pro Source, including:

     a.     OTT's 2004 personal tax return showing personal income of $437,000.

     b.     OTT's 2005 personal tax return showing personal income of $875,000.

     c.     OTT's 2006 personal tax return showing personal income of $2.8 million.

     d.     OTT's 2007 personal tax return showing personal income of $3.1 million.

     e.     OTT's 2007 financial statement showing net worth of $4 million.

     f.     OTT's 2008 financial statement showing net worth of $8.1 million.

     g.     Emily, Inc.'s 2004 tax return showing business income of $318,000.

     h.     Emily, Inc.'s 2005 tax return showing business income of $829,000.

     i.     Emily, Inc.'s 2006 tax return showing business income of $2.7 million.

     j.     Emily, Inc.'s 2007 tax return showing business income of $2.9 million.

     k.     Various Emily, Inc. monthly and fiscal year end financial statements.

8.     It was further part of the scheme that OTT altered and manipulated Pro Source bank account statements from Grundy Bank to make it appear that Pro Source had significant amounts of money in its account, when in reality Pro Source did not have the money in its account reflected on the manipulated statements. OTT submitted these altered and manipulated bank account statements to Fifth Third Bank on a periodic basis in order to maintain and expand Pro Source's lines of credit with Fifth Third Bank.

9.     It was further part of the scheme that OTT faxed false flooring requests from Pro Source's offices in Morris, Illinois, to Fifth Third Bank's offices in Cincinnati, Ohio, including

flooring requests with fictitious VINs for non-existent RVs, or real VINs for actual RVs but with dramatically inflated values.

10.     It was further part of the scheme that OTT sometimes "double floored" vehicles by obtaining financing from GE Capital and also submitting a flooring request to Fifth Third Bank for the same vehicle, thereby obtaining funds from both GE Capital and Fifth Third Bank for the same vehicle. OTT did not disclose to either GE Capital or Fifth Third Bank that he was obtaining funds for the same vehicle from another lender.

11.     It was further part of the scheme that when floor checkers from Datascan came to Pro Source to audit the vehicles listed on the Fifth Third Bank flooring requests, OTT took steps to mislead them by printing up fake VINs on paper and pasting these fake VINs onto vehicles with other VINs to make it appear that Pro Source had the vehicles with VINs that matched the Fifth Third Bank flooring requests.

12.     It was further part of the scheme that OTT fabricated MSOs and provided them to floor checkers employed by Datascan. Because OTT was creating fictitious VINs and fictitious vehicles on most of the flooring requests he was sending to Fifth Third Bank, and not purchasing a vehicle from a manufacturer after receiving the funds from Fifth Third Bank, OTT did not have legitimate MSOs from vehicle manufacturers to show the floor checkers when they were conducting audits for Datascan. OTT therefore fabricated MSOs to create the appearance that the vehicles listed on the Fifth Third Bank flooring requests existed in Pro Source's inventory. OTT then submitted these fictitious MSOs and VINs to the Illinois Secretary of State with applications for title and registration for the non-existent RVs in the names of individual owners, thereby obtaining Illinois vehicle titles for non-existent RVs.

13.     It was further part of the scheme that between approximately May 2007 and October 2008, Fifth Third Bank extended Pro Source approximately $31,368,457 in funds through its five lines of credit, and after periodic repayments of some of the loans suffered actual total net losses of approximately $27,123,202 as a result of the direct lending fraud on Fifth Third Bank.

**Manner and Means of the Straw Borrower Fraud**

14.     It was further part of the scheme that between approximately early 2003 and October 2008, OTT fraudulently caused the financial institutions to issue approximately 200 additional fraudulent loans to purported individual borrowers in a total amount of approximately $42.375 million. At least 62 of these additional loans were made to the other defendants, who served as straw borrowers OTT enlisted in the scheme so they could obtain fraudulent loan proceeds to share with OTT even though these individuals did not actually purchase the vehicles for which the loans were made, and the vehicles generally did not exist.

15.     It was further part of the scheme that OTT and the straw borrowers seeking loans prepared and caused to be prepared false loan applications and supporting financial documents that generally included greatly inflated monthly and annual income figures, fabricated tax returns and Form W-2 statements regarding income, generally created with the assistance of defendant MCMAHON, and false financial statements purporting to support the false incomes claimed by the straw borrowers in the loan applications.

16.     It was further part of the scheme that OTT and the straw borrowers submitted these fraudulent loan packages to the financial institutions in support of loan requests, generally for very expensive RVs which did not in fact exist but which OTT and the straw borrowers falsely claimed Pro Source was selling to the straw borrowers. Each straw borrower knew that the victim banks

11

would rely on the submitted false financial information and records when deciding whether to approve a loan or enter into a Loan Agreement. Often the straw borrowers attended the loan closings and signed the loan closing documents at the financial institutions, knowing that the vehicles they were seeking loans for did not exist and that the loan applications and financial documents contained false information.

17.    It was further part of the scheme that OTT generally furnished the financial institutions with fabricated VINs and MSOs that he created for non-existent RVs in order to induce the financial institutions to believe their loans to the straw borrowers were secured and collateralized by actual RVs.

18.    It was further part of the scheme that OTT and PLUTA provided and caused to be provided false information to the financial institutions regarding non-existent insurance policies on the non-existent RVs for which OTT and the straw borrowers fraudulently obtained loans. PLUTA worked in an insurance agency in South Bend, Indiana, and at OTT's direction posed as an underwriter for a non-existent insurance company OTT and PLUTA called North American Casualty Company, a business that OTT and PLUTA falsely informed the financial institutions had issued legitimate insurance policies on the non-existent RVs.

19.    It was further part of the scheme that the funds disbursed by the financial institutions as payment for the non-existent RVs were generally deposited into Emily Inc.'s bank account at Grundy Bank, after which OTT periodically disbursed the loan proceeds to the straw borrowers to use to operate and support their own businesses, make investments in other businesses and entities, maintain their lifestyles, and make monthly payments on some of the loans in order to perpetuate the scheme.

20.     It was further part of the scheme that as the fraudulent loan scheme progressed over time, OTT obtained additional fraudulent loans to make payments on earlier fraudulent loans that he and the straw borrowers had obtained in order to keep the scheme going and conceal its operation from the financial institutions. OTT used funds from the Emily Inc. Grundy Bank account to make periodic payments on these additional fraudulently-obtained loans, as well as for payroll and business expenses to keep Pro Source operating.

21.     It was further part of the scheme that between approximately January 2003 and October 2008 the financial institutions extended OTT, Pro Source, and the straw borrowers approximately $42,375,436 in funds, and suffered actual total net losses of approximately $29,512,924 as a result of the fraudulent straw borrower aspect of the scheme.

**Defendants' Use of the Fraudulent Loan Proceeds**

22.     It was further part of the scheme that OTT converted a portion of the fraudulently-obtained proceeds from the financial institutions to his personal use, including, among other things, to fund and operate Pro Source, which was operating at a loss from at least approximately 2001 through 2008, to purchase a house in Elburn, Illinois for approximately $679,491 and make subsequent improvements which increased the amount invested in the home to approximately $1,122,708, to purchase a vacation home in Butternut, Wisconsin for approximately $258,126, to purchase a rental home in South Elgin, Illinois for approximately $350,000, to purchase a Sky Hawk 172 Cessna airplane and hanger for approximately $200,000, to purchase Ford pick-up trucks and other vehicles for family members and employees of Pro Source, and to invest in and purchase other vehicle dealerships, including investing over $3.6 million in Huntley Chevrolet with MIGNIN, over $1.056 million in Liberty Cycle with MIGNIN, and to purchase the building in which TUF

Powersports was housed in DeKalb, Illinois, so that STACY could operate TUF Powersports.

23.     It was further part of the scheme that OTT diverted money to the other participants

as payment for their assistance with and participation in the scheme, including:

a.      Between approximately March 2006 and October 2008, HANSON acted as a straw borrower on approximately seven fraudulent loans totaling approximately $2,812,088 arranged by OTT from various financial institutions. After making certain periodic payments on some of these fraudulent loans, HANSON retained approximately $2,409,064 in net fraud proceeds, which funds HANSON used to operate Safety First Racing, LLC, and for personal expenditures.

b.      Between approximately January 2007 and September 2008, WEICHEL acted as a straw borrower on approximately five fraudulent loans totaling approximately $2,113,917 arranged by OTT from various financial institutions. After making certain periodic payments on some of these fraudulent loans, WEICHEL retained approximately $1,944,329 in net fraud proceeds, which funds WEICHEL used to operate Center of Gravity, LLC, and for personal expenditures, including investments in foreign entities in Costa Rica, Italy, and Canada of approximately $1,261,200.

c.      Between approximately January 2004 and October 2008, MIGNIN acted as a straw borrower on approximately ten fraudulent loans totaling approximately $3,819,813 arranged by OTT from approximately eight different financial institutions. After making certain periodic payments on some of these fraudulent loans, MIGNIN retained approximately $3,462,111 in net fraud proceeds, which funds MIGNIN used to operate Schaumburg Honda, Liberty Cycle, and for personal investments and expenditures, including approximately $450,000 toward the construction of his personal residence, checks payable to cash of approximately $308,815, and an $863,000 investment in Huntley Chevrolet.

d.      Between approximately January 2005 and September 2008, DARVILLE acted as a straw borrower on approximately nine fraudulent loans totaling approximately $2,484,533 arranged by OTT from various financial institutions. After making certain periodic payments on some of these fraudulent loans, DARVILLE retained approximately $2,066,376 in net fraud proceeds, which funds DARVILLE used to operate Racine MotorSports, LTD, and for personal expenditures.

e.      Between approximately October 2005 and September 2008, STACY acted as

14

a straw borrower on approximately six fraudulent loans totaling approximately $2,538,630 arranged by OTT from various financial institutions. After making certain periodic payments on some of these fraudulent loans, STACY used a potion of these funds to operate TUF Powersports, and for personal expenditures.

f.      Between approximately January 2003 and September 2008, MATERYN acted as a straw borrower on approximately seven fraudulent loans totaling approximately $2,351,464 arranged by OTT from various financial institutions. After making certain periodic payments on some of these fraudulent loans, MATERYN used a potion of these funds to operate Pro Source Motorsports in Michigan, and for personal expenditures.

g.      Between approximately January 2005 and November 2008, PLUTA, under her former name of JILL OTT, acted as a straw borrower on approximately five fraudulent loans totaling approximately $997,253 arranged by OTT from various financial institutions. After making certain periodic payments on some of these fraudulent loans, PLUTA retained approximately $680,334 in net fraud proceeds, which funds PLUTA used for personal expenditures.

h.      Between approximately January 2005 and October 2008, QUICK acted as a straw borrower on approximately seven fraudulent loans arranged by OTT from approximately six different financial institutions, the proceeds of which OTT caused to be deposited into the Emily, Inc. operating bank account at Grundy Bank and the Valley Community Bank payroll account. QUICK later wrote checks and directed electronic transfers from these accounts in the amount of approximately $1,032,495, which she used for personal purposes, including expenditures for her personal residence, automobiles for at least three of her children, college tuition for at least two of her children, and personal credit card payments totaling approximately $550,125.

24.    It was further part of the scheme that in order to fraudulently induce the financial institutions to issue loans and extend credit to the defendants, and to continue lending relationships that had already been established, the defendants made various false, fraudulent, and misleading statements, representations, and promises which they knew to be false and fraudulent, and concealed material facts, including in the manner summarized and described in paragraphs 25 through 45 below.

25.     On or about December 8, 2006, STACY and OTT, to induce First Midwest Bank to issue a $443,468 loan to STACY, knowingly made false statements to the bank in that STACY and OTT submitted a false credit application and personal financial statement that stated that STACY had $2,243,000 in assets and a gross income $328,000 per year, when in fact STACY and OTT knew that STACY's assets and gross income were far less than those amounts.

26.     On or about September 19, 2007, STACY and OTT, to induce State Farm Bank to issue a $482,417 loan to STACY, knowingly made false statements to the bank in that STACY and OTT falsely stated in a loan application that STACY's company, TUF Powersports, had an income of $23,333 per month and STACY had an income of $8,333 per month, when in fact STACY and OTT knew that TUF Powersports and STACY's monthly incomes were far less than those amounts.

27.     On or about September 28, 2008, STACY and OTT, to induce Tech Credit Union to issue a $248,034 loan to STACY, knowingly made false statements to the Credit Union in that STACY and OTT provided the credit union with a fabricated 2007 Form W-2 that falsely listed STACY's wages and salary as $622,000, when in fact STACY and OTT knew that STACY's 2007 Form W-2 income was far less than that amount.

28.     On or about July 24, 2007, DARVILLE and OTT, to induce State Farm Bank to issue a $400,000 loan to DARVILLE, knowingly made false statements to the bank in that DARVILLE and OTT provided the bank with a fabricated 2005 individual income tax return that falsely listed DARVILLE's adjusted gross income as $481,049 and a fabricated 2006 individual income tax return that falsely listed DARVILLE's adjusted gross income as $496,328, when in fact DARVILLE and OTT knew these tax returns were fabricated and that DARVILLE's actual adjusted gross income during 2005 and 2006 was far less than those amounts.

16

29.     On or about August 4, 2008, DARVILLE and OTT, to induce First Midwest Bank to issue a $475,294 loan to DARVILLE, knowingly made false statements to the bank in that DARVILLE and OTT provided the bank with a credit application that falsely stated that DARVILLE's monthly income was $70,833 and that he had over $2,000,000 in assets, when in fact DARVILLE and OTT knew DARVILLE's monthly income and assets were far less than those amounts.

30.     On or about July 24, 2007, DARVILLE and OTT, to induce GE Money Bank to issue a $450,000 loan in DARVILLE's name to Pro Source, knowingly made false statements to the bank in that DARVILLE and OTT provided the bank with a fabricated 2005 individual income tax return that falsely listed DARVILLE's adjusted gross income as $481,049, a fabricated 2006 individual income tax return that falsely listed DARVILLE's adjusted gross income as $496,328, a credit application that falsely stated that DARVILLE's 2007 income was $495,000, and a false personal financial statement that stated that DARVILLE had $250,000 in his checking and savings account in June 2007, when in fact DARVILLE and OTT knew the 2005 and 2006 tax returns were fabricated, that DARVILLE's actual adjusted gross income during 2005 and 2006 was far less than those amounts, that DARVILLE's 2007 income was far less than $450,000, and that DARVILLE had far less than $250,000 in his personal bank accounts.

31.     On or about October 19, 2004, MIGNIN and OTT, to induce Horizon Bank to issue a $315,689 loan in MIGNIN's name to Pro Source, knowingly made false statements to the bank in that MIGNIN and OTT provided the bank with a credit application and consumer loan application that falsely stated MIGNIN's annual income as $300,000 and falsely stated that MIGNIN made a $50,000 down payment for the purchase of a 2004 Fleetwood American Eagle motor home, Vehicle

Identification Number 1V5NC9TJ15N396825, a vehicle MIGNIN and OTT knew did not exist.

32.     On or about November 22, 2005, MIGNIN and OTT, to induce Hawthorne Credit

Union to issue a $198,023 loan to MIGNIN, knowingly made false statements to the credit union in

that MIGNIN and OTT provided the credit union with a fabricated 2004 Form W-2 for MIGNIN that

falsely stated MIGNIN's wages and salary from his company, Northwest Investment Company, were

$387,890, and a loan application that falsely stated MIGNIN's monthly gross pay was $33,333, when

in fact MIGNIN and OTT knew that MIGNIN's 2004 wage and salary income was far less than

$387,890 and that MIGNIN's monthly gross pay was far less than $33,333.

33.     On or about July 23, 2007, MIGNIN and OTT, to induce GE Money Bank to issue

a $210,012 loan in MIGNIN's name to Pro Source, knowingly made false statements to the bank in

that MIGNIN and OTT provided the bank with a credit application that falsely stated MIGNIN's

annual income was $360,000, a consumer loan application that falsely stated that MIGNIN's monthly

income was $30,000 per month, and a fabricated 2006 Form W-2 that falsely stated MIGNIN's

wages and salary from his company, Northwest Investment Company, were $372,096, when in fact

MIGNIN and OTT knew that MIGNIN's monthly and annual income was far less than represented.

34.     On or about May 23, 2006, HANSON and OTT, to induce Hawthorne Credit Union

to issue a $475,088 loan to HANSON, knowingly made false statements to the credit union in that

HANSON and OTT provided the credit union with a fabricated 2005 individual income tax return

that falsely stated that HANSON's adjusted gross income from Safety First Racing, LLC was

$298,000 and a fabricated 2005 Form W-2 that falsely stated Hanson's wages from Safety First

Racing, LLC were $298,019, when in fact HANSON and OTT knew the tax return and Form W-2

were fabricated, and that HANSON's income was far less than reflected on the fabricated tax return

and Form W-2.

35.     On or about February 23, 2007, HANSON and OTT, to induce State Farm Bank to issue a $487,083 loan to HANSON, knowingly made false statements to the bank in that HANSON and OTT provided the bank with a loan application that falsely stated that HANSON's monthly income from his company, Safety First Racing, LLC, was $30,833 per month, a fabricated 2004 individual income tax return that falsely stated that HANSON's adjusted gross income was $301,172, a fabricated 2005 Form W-2 that falsely reflected HANSON's wages from Safety First Racing, LLC were $347,879, a fabricated 2005 individual income tax return that falsely stated that HANSON's adjusted gross income was $348,159, and a fabricated 2006 Form W-2 that falsely stated that HANSON's wages from Safety First Racing, LLC were $369,979, when in fact HANSON and OTT knew that HANSON's monthly income was far less than $30,833 per month, the tax returns were fabricated, and that HANSON's actual income during 2004, 2005, and 2006 was far less than the amounts reflected on the fabricated tax returns and Form W-2s.

36.     On or about February 23, 2007, HANSON and OTT, to induce First Midwest Bank to issue a $485,683 loan to HANSON, knowingly made false statements to the bank in that HANSON and OTT provided the bank with a fabricated 2005 individual income tax return that falsely stated that  HANSON's adjusted gross income was $348,159, a fabricated 2005 Form W-2 that falsely stated HANSON's wages from Safety First Racing, LLC were $347,879, and a credit application and personal financial statement that falsely stated that HANSON's income was $369,980 and that he had over $2.5 million in assets, when in fact HANSON and OTT knew that HANSON's income and assets were far less than reflected on the credit application and personal financial statement, the tax returns were fabricated, and that HANSON's actual income during 2005 was far

less than the amount reflected on the fabricated tax return and Form W-2.

37.     On or about January 25, 2007, WEICHEL and OTT, to induce GE Money Bank to issue a $398,917 loan in WEICHEL's name to Pro Source, knowingly made false statements to the bank in that WEICHEL and OTT provided the bank with a credit application that falsely stated WEICHEL's annual income was $280,999, and a fabricated 2005 individual income tax return that falsely stated that WEICHEL had adjusted gross income of $592,268, when in fact WEICHEL and OTT knew that WEICHEL's annual income was far less than the amounts reflected on the credit application and fabricated tax return.

38.     On or about April 13, 2007, WEICHEL and OTT, to induce State Farm Bank to issue a $461,907 loan to WEICHEL, knowingly made false statements to the bank in that WEICHEL and OTT provided the bank with a fabricated 2004 individual tax return that falsely stated that WEICHEL had an adjusted gross income of $580,120, a fabricated 2005 individual tax return that falsely stated that WEICHEL had an adjusted gross income of 592,268, and a vehicle loan application that falsely stated that WEICHEL's monthly income from his business, Center of Gravity, LLC was $35,000, when in fact WEICHEL and OTT knew that the tax returns were fabricated, that WEICHEL's actual adjusted gross income was far less than the amounts reflected on the fabricated tax returns, and that WEICHEL's monthly income from Center of Gravity, LLC was far less than $35,000.

39.     On or about April 13, 2007, WEICHEL and OTT, to induce First Midwest Bank to issue a $484,477 loan to WEICHEL, knowingly made false statements to the bank in that WEICHEL and OTT provided the bank with a fabricated 2004 individual tax return that falsely stated that WEICHEL had $580,120 in adjusted gross income, a fabricated 2005 individual tax return that

20

falsely stated that WEICHEL had $592,268 in adjusted gross income, and a credit application that falsely stated WEICHEL had $2,864,000 in assets including $390,000 in cash, when in fact WEICHEL and OTT knew that WEICHEL's assets were far less than reflected on the credit application, the tax returns were fabricated, and that WEICHEL's actual adjusted gross income was far less than the amounts reflected on the fabricated tax returns.

40.     On or about January 4, 2007, MATERYN and OTT, to induce State Farm Bank to issue a $481,327 loan to MATERYN, knowingly made false statements to the bank in that MATERYN and OTT provided the bank with a vehicle loan application that falsely stated that MATERYN had a salary of $38,500 per month from his business, Pro Source Motorsports, and a fabricated 2005 individual tax return that falsely stated that MATERYN had an adjusted gross income of $496,221, when in fact MATERYN and OTT knew that MATERYN's salary was far less than reflected on the vehicle loan application, and his adjusted gross income in 2005 was far less than shown on the fabricated tax return.

41.     On or about January 4, 2007, MATERYN and OTT, to induce JP Morgan Chase Bank to issue a $128,755 loan to MATERYN, knowingly made false statements to the bank in that MATERYN and OTT provided the bank with documents purporting to show that MATERYN was purchasing, and that Chase's loan was secured by, a 2007 Mercedes Benz-Sports Coupe SL55, Vehicle Identification Number WBBSK72K72F899042, when MATERYN and OTT knew that the VIN was false and the vehicle did not exist.

42.     On or about January 5, 2008, MATERYN and OTT, to induce First Midwest Bank to issue a $498,096 loan to MATERYN, knowingly made false statements to the bank in that MATERYN and OTT provided the bank with a credit application and personal financial statement

that falsely stated MATERYN had over $5 million in assets and a salary of $500,000 from his business, Pro Source Motorsports, when in fact MATERYN and OTT knew that MATERYN's assets and salary were far less than reflected on the credit application and personal financial statement.

43. On or about December 3, 2005, PLUTA, aka JILL OTT, and OTT, to induce Hawthorne Credit Union to issue a $398,595 loan to PLUTA, known at the time as JILL OTT, knowingly made false statements to the credit union in that PLUTA AND OTT provided the credit union with a credit application and personal financial statement that falsely listed JILL OTT's employer as North American Casualty Company with a salary of $23,666 per month, and a fabricated 2004 Form W-2 that falsely stated that JILL OTT had annual wage and salary income of $244,500 from North American Casualty Company, when in fact JILL OTT and OTT knew that JILL OTT's salary was far less than reflected on the credit application and financial statement, that North American Casualty Company did not exist, that the Form W-2 was fabricated, and that JILL OTT's actual income was far less than the amounts reflected on the fabricated Form W-2.

44. On or about June 9, 2006, PLUTA, aka JILL OTT, and OTT, to induce First Midwest Bank to issue a $486,648 loan to PLUTA, known at the time as JILL OTT, knowingly made false statements to the bank in that PLUTA AND OTT provided the bank with a credit application and personal financial statement that falsely listed JILL OTT's employer as North American Casualty Company, falsely stated that she had a salary of $484,800 and over $3 million in assets, a fabricated 2004 individual tax return that falsely stated that JILL OTT had income of $475,854, and a fabricated 2005 individual tax return that falsely stated that JILL OTT had income of $484,322, and, when in fact JILL OTT and OTT knew that JILL OTT's salary and assets were far less than reflected on the credit application and financial statement, that North American Casualty Company did not exist, that

22

the tax returns were fabricated, and that JILL OTT's actual income was far less than the amounts reflected on the fabricated tax returns.

45.     On or about July 8, 2008, PLUTA, aka JILL OTT, and OTT, to induce Tech Credit Union to issue a $240,384 loan to PLUTA, known at the time as JILL OTT, knowingly made false statements in that PLUTA AND OTT provided the credit union with a loan application that falsely listed JILL OTT's employer as North American Casualty Company with an annual income of $780,000, and a fabricated 2007 individual tax return that falsely stated that JILL OTT had income of $780,468 from North American Casualty Company, when in fact JILL OTT and OTT knew that JILL OTT's salary was far less than reflected on the loan application, that North American Casualty Company did not exist, that the 2007 tax return was fabricated, and that JILL OTT's actual income was far less than the amount reflected on the fabricated tax return.

46.     On or about March 1, 2007, in the Northern District of Illinois, Eastern Division, and elsewhere,

> RUSSELL S. OTT,
> BRIAN MCMAHON, and
> JOAN M. QUICK,

defendants herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to Fifth Third Bank, which contained materially false statements to Fifth Third Bank:

a.     OTT's 2004 personal tax return showing personal income of $437,000.

b.     OTT's 2005 personal tax return showing personal income of $875,000.

c.     OTT's 2006 personal tax return showing personal income of $2.8 million.

d.     OTT's 2007 financial statement showing net worth of $4 million.

e.     Emily, Inc.'s 2004 tax return showing business income of $318,000.

      f.      Emily, Inc.'s 2005 tax return showing business income of $829,000.

      g.      Emily, Inc.'s 2006 tax return showing business income of $2.7 million.

In violation of Title 18, United States Code, Section 1344.

## **COUNT TWO**

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.　　Paragraphs 1 through 23 of Count One are incorporated here.

2.　　On or about December 8, 2006, at Aurora, in the Northern District of Illinois, Eastern Division,

### ANDREW W. STACY,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to First Midwest Bank, for the purpose of inducing the bank to issue a $443,468 loan to STACY, which contained materially false statements: a false credit application and personal financial statement that stated STACY had $2,243,000 in assets and a gross income $328,000 per year, when in fact STACY and OTT knew that STACY's assets and gross income were far less than those amounts;

In violation of Title 18, United States Code, Section 1344.

## COUNT THREE

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about September 19, 2007, at Plainfield, in the Northern District of Illinois, Eastern Division,

### ANDREW W. STACY,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to State Farm Bank, for the purpose of inducing the bank to issue a $482,417 loan to STACY, which contained materially false statements: a loan application that stated that STACY's company, TUF Powersports, had revenue of $23,333 per month and STACY had an income of $8,333 per month, when in fact STACY and OTT knew that TUF Powersports and STACY's monthly income was far less than those amounts;

In violation of Title 18, United States Code, Section 1344.

## COUNT FOUR

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about September 28, 2008, at Joliet, in the Northern District of Illinois, Eastern Division,

### ANDREW W. STACY,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to Tech Credit Union, for the purpose of inducing the credit union to issue a $248,034 loan to STACY, which contained materially false statements: a fabricated 2007 Form W-2 that  falsely listed STACY's wages and salary as $622,000, when in fact STACY and OTT knew that STACY's 2007 Form W-2 income was far less than that amount;

In violation of Title 18, United States Code, Section 1344.

## **COUNT FIVE**

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about July 24, 2007, at Plainfield, in the Northern District of Illinois, Eastern Division,

SCOTT F. DARVILLE,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to State Farm Bank, for the purpose of inducing the bank to issue a $400,000 loan to DARVILLE, which contained materially false statements: a fabricated 2005 individual income tax return that falsely listed DARVILLE's adjusted gross income as $481,049 and a fabricated 2006 individual income tax return that falsely listed DARVILLE's adjusted gross income as $496,328, when in fact DARVILLE and OTT knew these tax returns were fabricated and that DARVILLE's actual adjusted gross income during 2005 and 2006 was far less than those amounts;

In violation of Title 18, United States Code, Section 1344.

## COUNT SIX

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1 through 23 of Count One are incorporated here.

2.     On or about August 4, 2008, at Gurnee, in the Northern District of Illinois, Eastern Division,

SCOTT F. DARVILLE,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to First Midwest Bank, for the purpose of inducing the bank to issue a $475,294 loan to DARVILLE, which contained materially false statements: a credit application that falsely stated that DARVILLE's monthly income was $70,833 and that he had over $2 million in assets, when in fact DARVILLE and OTT knew DARVILLE's monthly income and assets were far less than those amounts;

In violation of Title 18, United States Code, Section 1344.

## COUNT SEVEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1 through 23 of Count One are incorporated here.

2.     On or about July 24, 2007, at Morris, in the Northern District of Illinois, Eastern Division,

### SCOTT F. DARVILLE,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to GE Money Bank, for the purpose of inducing the bank to issue a $450,000 loan in DARVILLE's name to Pro Source, which contained materially false statements: a fabricated 2005 individual income tax return that falsely listed DARVILLE's adjusted gross income as $481,049, a fabricated 2006 individual income tax return that falsely listed DARVILLE's adjusted gross income as $496,328, a credit application that falsely stated that DARVILLE's 2007 income was $495,000, and a false personal financial statement that stated that DARVILLE had $250,000 in his checking and savings account in June 2007, when in fact DARVILLE and OTT knew the 2005 and 2006 tax returns were fabricated, that DARVILLE's actual adjusted gross income during 2005 and 2006 was far less than those amounts, that DANVILLE's 2007 income was far less than $450,000, and that DARVILLE had far less than $250,000 in his personal bank accounts;

In violation of Title 18, United States Code, Section 1344.

## COUNT EIGHT

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about October 19, 2004, at Morris, in the Northern District of Illinois, Eastern Division, and elsewhere,

F. PETER MIGNIN,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to Horizon Bank, for the purpose of inducing Horizon Bank to issue a $315,689 loan in MIGNIN's name to Pro Source, which contained materially false statements: a credit application and consumer loan application that falsely stated MIGNIN's annual income as $300,000 and falsely stated that MIGNIN made a $50,000 down payment for the purchase of a 2004 Fleetwood American Eagle motor home, Vehicle Identification Number 1V5NC9TJ15N396825, a vehicle MIGNIN and OTT knew did not exist;

In violation of Title 18, United States Code, Section 1344.

## COUNT NINE

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1 through 23 of Count One are incorporated here.

2.     On or about November 22, 2005, at Naperville, in the Northern District of Illinois, Eastern Division,

### F. PETER MIGNIN,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to Hawthorne Credit Union, for the purpose of inducing the bank to issue a $198,023 loan to MIGNIN, which contained materially false statements: a fabricated 2004 Form W-2 for MIGNIN that falsely stated MIGNIN's wages and salary from his company, Northwest Investment Company, were $387,890, and a loan application that falsely stated MIGNIN's monthly gross pay was $33,333, when in fact MIGNIN and OTT knew that MIGNIN's 2004 wage and salary income was far less than $387,890 and that MIGNIN's monthly gross pay was far less than $33,333;

In violation of Title 18, United States Code, Section 1344.

## COUNT TEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.    Paragraphs 1 through 23 of Count One are incorporated here.

2.    On or about July 23, 2007 at Morris, in the Northern District of Illinois, Eastern Division, and elsewhere,

### F. PETER MIGNIN,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to GE Money Bank, for the purpose of inducing GE Money Bank to issue a $210,012 loan in MIGNIN's name to Pro Source, which contained materially false statements: a credit application that falsely stated MIGNIN's annual income was $360,000, a consumer loan application that falsely stated that MIGNIN's monthly income was $30,000 per month, and a fabricated 2006 Form W-2 that falsely stated MIGNIN's wages and salary from his company, Northwest Investment Company, were $372,096, when in fact MIGNIN and OTT knew that MIGNIN's annual and monthly income was far less than stated, that the Form W-2 was fabricated, and that MIGNIN's 2006 salary was far less than $372,096;

In violation of Title 18, United States Code, Section 1344.

## COUNT ELEVEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about May 23, 2006 at Naperville, in the Northern District of Illinois, Eastern Division,

### KEVIN D. HANSON,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to Hawthorne Credit Union, for the purpose of inducing the bank to issue a $475,088 loan to HANSON, which contained materially false statements: a fabricated 2005 individual income tax return that falsely stated that HANSON's adjusted gross income from Safety First Racing, LLC was $298,000 and a fabricated 2005 Form W-2 that falsely stated Hanson's wages from Safety First Racing, LLC were $298,019, when in fact HANSON and OTT knew the tax return and Form W-2 were fabricated, and that HANSON's income was far less than reflected on the fabricated tax return and Form W-2;

In violation of Title 18, United States Code, Section 1344.

## COUNT TWELVE

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1 through 23 of Count One are incorporated here.

2.     On or about February 23, 2007, at Plainfield, in the Northern District of Illinois, Eastern Division,

### KEVIN D. HANSON,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to State Farm Bank, for the purpose of inducing the bank to issue a $487,083 loan to HANSON, which contained materially false statements: a loan application that falsely stated that HANSON's monthly income from his company, Safety First Racing, LLC, was $30,833 per month, a fabricated 2004 individual income tax return that falsely stated that HANSON's adjusted gross income was $301,172, a fabricated 2005 Form W-2 that falsely reflected HANSON's wages from Safety First Racing, LLC were $347,879, a fabricated 2005 individual income tax return that falsely stated that HANSON's adjusted gross income was $348,159, and a fabricated 2006 Form W-2 that falsely stated that HANSON's wages from Safety First Racing, LLC were $369,979, when in fact HANSON and OTT knew that HANSON's monthly income was far less than $30,833 per month, the tax returns were fabricated, and that HANSON's actual income during 2004, 2005, and 2006 was far less than the amounts reflected on the fabricated tax returns and Form W-2s;

In violation of Title 18, United States Code, Section 1344.

## **COUNT THIRTEEN**

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about February 23, 2007, at Aurora, in the Northern District of Illinois, Eastern Division,

### KEVIN D. HANSON,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to First Midwest Bank, for the purpose of inducing the bank to issue a $485,683 loan to HANSON, which contained materially false statements: a fabricated 2005 individual income tax return that falsely stated that HANSON's adjusted gross income was $348,159, a fabricated 2005 Form W-2 that falsely stated HANSON's wages from Safety First Racing, LLC were $347,879, and a credit application and personal financial statement that falsely stated that HANSON's income was $369,980 and that he had over $2.5 million in assets, when in fact HANSON and OTT knew that HANSON's income and assets were far less than reflected on the credit application and personal financial statement, the tax returns were fabricated, and that HANSON's actual income during 2005 was far less than the amount reflected on the fabricated tax return and Form W-2;

In violation of Title 18, United States Code, Section 1344.

## COUNT FOURTEEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about January 25, 2007, at Morris, in the Northern District of Illinois, Eastern Division,

### OWEN A. WEICHEL,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to GE Money Bank, for the purpose of inducing GE Money Bank to issue a $398,917 loan in WEICHEL's name to Pro Source, which contained materially false statements: a credit application that falsely stated WEICHEL's annual income was $280,999, and a fabricated 2005 individual income tax return that falsely stated that WEICHEL had adjusted gross income of $592,268, when in fact WEICHEL and OTT knew that the tax return was fabricated, that WEICHEL's actual adjusted gross income was far less than the amount reflected on the fabricated tax return, and that WEICHEL's annual income was far less than reflected on the credit application;

In violation of Title 18, United States Code, Section 1344.

## COUNT FIFTEEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about April 13, 2007, at Plainfield, in the Northern District of Illinois, Eastern Division,

OWEN A. WEICHEL,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to State Farm Bank, for the purpose of inducing the bank to issue a $461,907 loan to WEICHEL, which contained materially false statements: a fabricated 2004 individual tax return that falsely stated that WEICHEL had an adjusted gross income of $580,120, a fabricated 2005 individual tax return that falsely stated that WEICHEL had an adjusted gross income of $592,268, and a vehicle loan application that falsely stated that WEICHEL's monthly income from his business, Center of Gravity, LLC was $35,000, when in fact WEICHEL and OTT knew that the tax returns were fabricated, that WEICHEL's actual adjusted gross income was far less than the amounts reflected on the fabricated tax returns, and that WEICHEL's monthly income from Center of Gravity, LLC was far less than $35,000;

In violation of Title 18, United States Code, Section 1344.

## COUNT SIXTEEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about April 13, 2007, at Aurora, in the Northern District of Illinois, Eastern Division,

### OWEN A. WEICHEL,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to First Midwest Bank, for the purpose of inducing the bank to issue a $484,477 loan to WEICHEL, which contained materially false statements: a fabricated 2004 individual tax return that falsely stated that WEICHEL had $580,120 in adjusted gross income, a fabricated 2005 individual tax return that falsely stated that WEICHEL had $592,268 in adjusted gross income, and a credit application that falsely stated WEICHEL had $2,864,000 in assets including $390,000 in cash, when in fact WEICHEL and OTT knew that WEICHEL's assets were far less than reflected on the credit application, the tax returns were fabricated, and that WEICHEL's actual adjusted gross income was far less than the amounts reflected on the fabricated tax returns;

In violation of Title 18, United States Code, Section 1344.

## COUNT SEVENTEEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about January 4, 2007, at Plainfield, in the Northern District of Illinois, Eastern Division,

### JOHN MATERYN,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to State Farm Bank, for the purpose of inducing the bank to issue a $481,327 loan to MATERYN, which contained materially false statements: a loan application that falsely stated that MATERYN had a salary of $38,500 per month from his business, Pro Source Motorsports, and a fabricated 2005 individual tax return that falsely stated that MATERYN had an adjusted gross income of $496,221, when in fact MATERYN and OTT knew that MATERYN's salary was far less than reflected on the vehicle application, and his adjusted gross income in 2005 was far less than shown on the fabricated tax return;

In violation of Title 18, United States Code, Section 1344.

## COUNT EIGHTEEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1 through 23 of Count One are incorporated here.

2.     On or about January 4, 2007, at Batavia, in the Northern District of Illinois, Eastern Division,

### JOHN MATERYN,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to JP Morgan Chase Bank, for the purpose of inducing the bank to issue a $128,755 loan to MATERYN, which contained materially false statements: loan documents purporting to show that MATERYN was purchasing, and that Chase's loan was secured by, a 2007 Mercedes Benz-Sports Coupe SL55, Vehicle Identification Number WBBSK72K72F899042, when in fact MATERYN and OTT knew that vehicle did not exist;

In violation of Title 18, United States Code, Section 1344.

41

## COUNT NINETEEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.    Paragraphs 1 through 23 of Count One are incorporated here.

2.    On or about January 5, 2008, at Aurora, in the Northern District of Illinois, Eastern Division,

JOHN MATERYN,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to First Midwest Bank, for the purpose of inducing the bank to issue a $498,096 loan to MATERYN, which contained materially false statements: a credit application and personal financial statement that falsely stated MATERYN had over $5 million in assets and a salary of $500,000 from his business, Pro Source Motorsports, when in fact MATERYN and OTT knew that MATERYN's assets and salary were far less than reflected on the credit application and personal financial statement;

In violation of Title 18, United States Code, Section 1344.

## **COUNT TWENTY**

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.    Paragraphs 1 through 23 of Count One are incorporated here.

2.    On or about December 3, 2005, at Naperville, in the Northern District of Illinois, Eastern Division,

JILL A. PLUTA, aka JILL OTT,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to Hawthorne Credit Union, for the purpose of inducing the bank to issue a $398,595 loan to PLUTA, known at the time as JILL OTT, which contained materially false statements: a credit application and personal financial statement that falsely listed JILL OTT's employer as North American Casualty Company with a salary of $23,666 per month, and a fabricated 2004 Form W2 that falsely stated that JILL OTT had annual wage and salary income of $244,500 from North American Casualty Company, when in fact JILL OTT and OTT knew that JILL OTT's salary was far less than reflected on the credit application and financial statement, that North American Casualty Company did not exist, that the Form W2 was fabricated, and that JILL OTT's actual income was far less than the amounts reflected on the fabricated Form W-2;

In violation of Title 18, United States Code, Section 1344.

## COUNT TWENTY-ONE

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 23 of Count One are incorporated here.

2.      On or about June 9, 2006, at Aurora, in the Northern District of Illinois, Eastern Division,

JILL A. PLUTA, aka JILL OTT,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to First Midwest Bank, for the purpose of inducing the bank to issue a $486,648 loan to PLUTA, known at the time as JILL OTT, which contained materially false statements: a credit application and personal financial statement that falsely listed JILL OTT's employer as North American Casualty Company, falsely stated that she had a salary of $484,800 and over $3,000,000 in assets, a fabricated 2004 individual tax return that falsely stated that JILL OTT had income of $475,854, and a fabricated 2005 individual tax return that falsely stated that JILL OTT had income of $484,322, and, when in fact JILL OTT and OTT knew that JILL OTT's salary and assets were far less than reflected on the credit application and financial statement, that North American Casualty Company did not exist, that the tax returns were fabricated, and that JILL OTT's actual income was far less than the amounts reflected on the fabricated tax returns;

In violation of Title 18, United States Code, Section 1344.

## COUNT TWENTY-TWO

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1 through 23 of Count One are incorporated here.

2.     On or about July 8, 2008, at Joliet, in the Northern District of Illinois, Eastern Division,

JILL A. PLUTA, aka JILL OTT,

defendant herein, knowingly executed and attempted to execute the above-described scheme by submitting the following documents to Tech Credit Union, for the purpose of inducing the bank to issue a $240,384 loan to PLUTA, known at the time as JILL OTT, which contained materially false statements: a loan application that falsely listed JILL OTT's employer as North American Casualty Company with an annual income of $780,000, and a fabricated 2007 individual tax return that falsely stated that JILL OTT had income of $780,468 from North American Casualty Company, when in fact JILL OTT and OTT knew that JILL OTT's salary was far less than reflected on the loan application, that North American Casualty Company did not exist, that the 2007 tax return was fabricated, and that JILL OTT's actual income was far less than the amount reflected on the fabricated tax return;

In violation of Title 18, United States Code, Section 1344.

## **COUNT TWENTY-THREE**

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1(a) of Count One is incorporated here.

2.      Emily, Inc. was a Subchapter S corporation and therefore required to file a United States Income Tax Return for an S Corporation (Form 1120S with schedules and attachments). The net business income or loss of Emily, Inc., after deduction of expenses, was then required to be reported on the United States Individual Income Tax Return (Form 1040 with schedules and attachments) of its shareholder, defendant OTT.

3.      In 2005 and 2006, OTT failed to accurately report the income of Emily, Inc. to the Internal Revenue Service on his tax return. For the year 2005, OTT reported on his Form 1040 Schedule E that Emily Inc. lost approximately $1,151, whereas Emily Inc. actually had net income of approximately $485,046, and the Schedule E income was therefore understated by approximately $486,197. For the year 2006, OTT reported on his Form 1040 Schedule E that Emily Inc. had income of approximately $3,374, whereas Emily Inc. actually had net income of approximately $975,066, and the Schedule E income was therefore understated by approximately $971,692.

4.      From approximately January 1, 2008 and continuing through on or about April 15, 2009, in the Northern District of Illinois, Eastern Division,

### RUSSELL S. OTT,

defendant herein, did willfully attempt to evade and defeat the payment of income tax due and owing by OTT to the United States in the amount of approximately $1,411,099 for the calendar year 2008, by committing the following affirmative act among others:

        a.      During calendar year 2008, OTT submitted fraudulent flooring requests to Fifth

Third Bank, transferred the fraudulent loan proceeds into an Emily, Inc. operating account at Grundy

Bank, and converted these fraud proceeds into personal assets by writing himself approximately

$250,000 in checks made payable to cash and $30,000 made payable to OTT personally, which OTT

deposited into his personal checking account at JP Morgan Chase Bank and used for his own

purposes. These checks were recorded on the books of Emily, Inc. as officer's salary or Costs of

Goods Sold, and not reported on a Form W-2 as income to OTT for 2008.

      b.      During calendar year 2008, OTT paid and caused to be paid personal

expenditures from Emily Inc., and caused these expenditures to be falsely identified as business

expenses or assets on the books and records of Emily, Inc. in order to conceal the nature of these

expenditures and to avoid reporting them as income on his personal income tax return, including:

      (1)      Approximately $101,674 for the renovation and maintenance of his personal residence.

      (2)      Approximately $30,000 for his personal mortgage that was recorded on Emily, Inc.'s business records as Cost of Goods Sold.

      (3)      Approximately $3,536,826 for an investment in Huntley Chevrolet.

      (4)      Approximately $258,126 for the purchase of a vacation home in Wisconsin, which was recorded on Emily, Inc.'s business records as Cost of Goods Sold.

      d.      OTT failed to file a United States Income Tax Return for an S Corporation

(Form 1120S with schedules and attachments) for Emily, Inc. for the year 2008.

      e.      OTT failed to file a United States Individual Income Tax Return (Form 1040

with schedules and attachments) for the year 2008.

      In violation of Title 26, United States Code, Section 7201.

## COUNT TWENTY-FOUR

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1(b) of Count One and paragraph 2 of Count Twenty-Three are incorporated here.

2.      In the course of preparing Emily, Inc.'s 2005 S Corporation tax return, on or about March 16, 2008 MCMAHON made false adjusting journal entries in Emily, Inc.'s QuickBooks financial records that reduced Emily, Inc.'s ordinary business income by approximately $1,511,975. Because Emily, Inc. was a flow-through entity and its ordinary business income or loss therefore flowed through to OTT's personal Individual Income Tax Return (Form 1040 with schedules and attachments), this caused line 17 of OTT's 2005 Form 1040, prepared by MCMAHON, to show a loss of $1,151 from Emily, Inc., when in fact line 17 of OTT's 2005 Form 1040 should have reported a profit from Emily, Inc. of approximately $485,046.

3.      On or about March 23, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

BRIAN MCMAHON,

defendant herein, willfully aided and assisted in the preparation and presentation to the Internal Revenue Service of a U.S. Individual Income Tax Return (Form 1040 with schedules and attachments) for OTT for calendar year 2005, which return was false and fraudulent as to a material matter, in that MCMAHON caused to be falsely represented and stated on line 17 of the return that Emily, Inc. had a loss of $1,151, whereas in fact, as MCMAHON knew, Emily, Inc. actually had a profit of approximately $485,046;

In violation of Title 26, United States Code, Section 7206(2).

## **COUNT TWENTY-FIVE**

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1 of Count Twenty-Four is incorporated here.

2.      In the course of preparing Emily, Inc.'s 2006 S Corporation tax return, on or about March 16, 2008 MCMAHON made false adjusting journal entries in Emily, Inc.'s QuickBooks financial records that reduced Emily, Inc.'s ordinary business income by approximately $2,609,764. Because Emily, Inc. was a flow-through entity and its ordinary business income or loss therefore flowed through to OTT's personal Individual Income Tax Return (Form 1040 with schedules and attachments), this caused line 17 of OTT's 2006 Form 1040, prepared by MCMAHON, to show a profit of $3,374 from Emily, Inc., when in fact line 17 of OTT's 2006 Form 1040 should have reported a profit from Emily, Inc. of approximately $975,066.

3.      On or about March 23, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

BRIAN MCMAHON,

defendant herein, willfully aided and assisted in the preparation and presentation to the Internal Revenue Service of a U.S. Individual Income Tax Return (Form 1040 with schedules and attachments) for OTT for calendar year 2006, which return was false and fraudulent as to a material matter, in that MCMAHON caused to be falsely represented and stated on line 17 of the return that Emily, Inc. had a profit of $3,374, whereas in fact, as MCMAHON knew, Emily, Inc. actually had a profit of approximately $975,066;

In violation of Title 26, United States Code, Section 7206(2).

49

## **COUNT TWENTY-SIX**

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1(f) of Count One is incorporated here.

2.      Between approximately March 2006 and October 2008, HANSON received approximately $2,812,088 as a straw borrower from approximately seven fraudulent loans arranged by OTT from financial institutions. After making certain periodic payments on some of these fraudulent loans, HANSON retained approximately $2,409,064 in net fraud proceeds, which funds HANSON used to operate Safety First Racing, LLC, and for personal expenditures.

3.      Between approximately March 2006 and October 2008, HANSON failed to report to the Internal Revenue Service net fraudulent loan proceeds of approximately $2,409,064 he received and expended in operating Safety First Racing, LLC, and for his personal expenditures, as income on his United States Individual Income Tax Returns (Form 1040 with schedules and attachments).

4.      On or about November 13, 2007, in the Northern District of Illinois, Eastern Division, and elsewhere,

### KEVIN D. HANSON,

defendant herein, did willfully make and subscribe a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2006, which return was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which return HANSON did not believe to be true and correct as to every material matter, in that the return omitted approximately $467,775 in net fraudulently-obtained loan proceeds HANSON received during 2006 from line 21 regarding "other income," or anywhere else on the return, whereas, as HANSON knew and believed, his total income during 2006 included

approximately $467,775 in net fraudulently-obtained loan proceeds;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-SEVEN

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1 through 3 of Count Twenty-Six are incorporated here.

2.     During the calendar year 2007, HANSON had and received gross income of approximately $1,692,000, including approximately $1,513,975 in net proceeds from fraudulently-obtained loans.

3.     By reason of such income, HANSON was required by law, following the close of the calendar year 2007 and on or before April 15, 2008, to make and file a United States Individual Income Tax Return (Form 1040 with schedules and attachments) to the appropriate Internal Revenue Service Center, or to a person assigned to receive returns at the appropriate local office of the Internal Revenue Service, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled.

4.     On or before April 15, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

KEVIN D. HANSON,

defendant herein, willfully failed to make and file the required income tax return;

In violation of Title 26, United States Code, Section 7203.

## COUNT TWENTY-EIGHT

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1(g) of Count One is incorporated here.

2.      Between approximately January 2007 and September 2008, WEICHEL received approximately $2,113,917 as a straw borrower from approximately five fraudulent loans arranged by OTT from financial institutions. After making certain periodic payments on some of these fraudulent loans, WEICHEL retained approximately $1,944,329 in net fraud proceeds, which funds WEICHEL used to operate Center of Gravity, LLC, and for personal expenditures, including investments in foreign entities in Costa Rica, Italy, and Canada of approximately $1,261,200.

3.      WEICHEL failed to report to the Internal Revenue Service the net fraudulent loan proceeds of approximately $1,944,329 he received and expended in operating Center of Gravity, LLC, and for his personal expenditures, as income on his United States Individual Income Tax Returns (Form 1040 with schedules and attachments).

4.      On or about October 13, 2008, in the Central District of California, and elsewhere,

OWEN A. WEICHEL,

defendant herein, did willfully make and subscribe a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2007, which return was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which return WEICHEL did not believe to be true and correct as to every material matter, in that the return omitted approximately $1,450,303 in net fraudulently-obtained loan proceeds WEICHEL received during 2007 from line 21 regarding "other income," or anywhere else on the return, whereas, as WEICHEL knew and believed, his total income during 2007 included

approximately $1,450,303 in net fraudulently-obtained loan proceeds;

In violation of Title 26, United States Code, Section 7206(1).

## **COUNT TWENTY-NINE**

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 3 of Count Twenty-Eight are incorporated here.

2.      During the calendar year 2008, WEICHEL had and received a gross income of approximately $590,000, including approximately $494,026 in net proceeds from fraudulently-obtained loans.

3.      By reason of such income, WEICHEL was required by law, following the close of the calendar year 2008 and on or before April 15, 2009, to make and file a United States Individual Income Tax Return (Form 1040 with schedules and attachments) to the appropriate Internal Revenue Service Center, or to a person assigned to receive returns at the appropriate local office of the Internal Revenue Service, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled.

4.      On or before April 15, 2009, in the Central District of California and elsewhere,

OWEN A. WEICHEL,

defendant herein, willfully failed to make and file the required income tax return.

In violation of Title 26, United States Code, Section 7203.

## COUNT THIRTY

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1(e) of Count One is incorporated here.

2.      Schaumburg Honda was a corporation required to file a United States Corporation Income Tax Return (Form 1120 with schedules and attachments) accurately reporting the income and expenses of the business. Liberty Cycle was a single member LLC and a "disregarded entity" for tax purposes, and its income and expenses were therefore reportable on MIGNIN's United States Individual Income Tax Return Form 1040 Schedule C.

3.      Between approximately January 2004 and October 2008, MIGNIN received approximately $3,819,813 as a straw borrower from approximately ten fraudulent loans arranged by OTT from approximately eight different financial institutions. After making certain periodic payments on some of these fraudulent loans, MIGNIN retained approximately $3,462,111 in net fraud proceeds, which funds MIGNIN used to operate Schaumburg Honda, Liberty Cycle, and for personal investments and expenditures, including approximately $450,000 toward the construction of his personal residence, checks payable to cash of approximately $308,815, and an $863,000 investment in Huntley Chevrolet.

4.      In November 2003 MIGNIN established a checking account in the name of Schaumburg Honda for his personal use at Harris Bank on which Schaumburg Honda's bookkeeper had no signatory authority. MIGNIN funded this account primarily with fraud proceeds obtained through OTT, and used the account to finance personal expenditures, including the construction of his personal residence. Between approximately January 3, 2004 and August 23, 2008, MIGNIN deposited approximately $2,331,207 in fraud proceeds into this Harris Bank account, including

during 2005 making at least seven deposits of cash to the account in amounts just under $10,000, totaling approximately $69,470.

5.      Between approximately January 2004 and October 2008, MIGNIN failed to report to the Internal Revenue Service the approximately $3,462,111 in net fraudulent loan proceeds he received and expended in operating Schaumburg Honda, Liberty Cycle, and for personal investments and expenditures such as Huntley Chevrolet, as income on his United States Individual Income Tax Returns (Form 1040 with schedules and attachments).

6.      From approximately January 1, 2007 and continuing through on or about April 15, 2008, in the Northern District of Illinois, Eastern Division,

F. PETER MIGNIN,

defendant herein, did willfully attempt to evade and defeat the payment of income tax due and owing by MIGNIN to the United States in the amount of approximately $272,344 for the calendar year 2007, by committing the following affirmative act among others:

a.      During calendar year 2007, MIGNIN obtained approximately $894,698 in fraudulent loan proceeds through OTT, and retained approximately $802,397 in net fraud proceeds that he used to operate Schaumburg Honda and Liberty Cycle, and for personal investments and expenditures.

b.      MIGNIN failed to file United States Corporation Income Tax Return (Form 1120 with schedules and attachments) for Schaumburg Honda for the year 2007.

c.      MIGNIN failed to file a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the year 2007.

In violation of Title 26, United States Code, Section 7201.

57

## COUNT THIRTY-ONE

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 5 of Count Thirty are incorporated here.

2.      From approximately January 1, 2008 and continuing through on or about April 15, 2009, in the Northern District of Illinois, Eastern Division,

F. PETER MIGNIN,

defendant herein, did willfully attempt to evade and defeat the payment of income tax due and owing by MIGNIN to the United States in the amount of approximately $522,820 for the calendar year 2008, by committing the following affirmative act among others:

a.      During calendar year 2008, MIGNIN obtained approximately $1,605,349 in fraudulent loan proceeds through OTT, and retained approximately $1,523,083 in net fraud proceeds that he used to operate Schaumburg Honda, Liberty Cycle, and for personal investments and expenditures, including an investment of approximately $863,000 in Huntley Chevrolet.

b.      MIGNIN failed to file United States Corporation Income Tax Return (Form 1120 with schedules and attachments) for Schaumburg Honda for the year 2008.

c.      MIGNIN failed to file a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the year 2008.

In violation of Title 26, United States Code, Section 7201.

## COUNT THIRTY-TWO

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraph 1(d) of Count One is incorporated here.

2.     Between approximately January 2005 and September 2008, DARVILLE received approximately $2,484,533 as a straw borrower from approximately nine fraudulent loans arranged by OTT from financial institutions. After making certain periodic payments on some of these fraudulent loans, DARVILLE retained approximately $2,066,376 in net fraud proceeds, which funds DARVILLE used to operate Racine MotorSports, LTD, and for personal expenditures.

3.     DARVILLE failed to report to the Internal Revenue Service the net fraudulent loan proceeds of approximately $2,066,376 he received and expended in operating Racine MotorSports, LTD, and for his personal expenditures, as income on his United States Individual Income Tax Returns (Form 1040 with schedules and attachments).

4.     On or about April 15, 2008, in the Eastern District of Wisconsin, and elsewhere,

SCOTT F. DARVILLE,

defendant herein, did willfully make and subscribe a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2007, which return was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which return DARVILLE did not believe to be true and correct as to every material matter, in that the return omitted approximately $336,313 in net fraudulently-obtained loan proceeds DARVILLE received during 2007 from line 21 regarding "other income," or anywhere else on the return, whereas, as DARVILLE knew and believed, his total income during 2007 included approximately $336,313 in net fraudulently-obtained loan proceeds;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY-THREE

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 3 of Count Thirty-Two are incorporated here.

2.      On or about April 23, 2009, in the Eastern District of Wisconsin, and elsewhere,

### SCOTT F. DARVILLE,

defendant herein, did willfully make and subscribe a United States Individual Income Tax Return

(Form 1040 with schedules and attachments) for the calendar year 2008, which return was verified

by a written declaration that it was made under the penalties of perjury and was filed with the Internal

Revenue Service, which return DARVILLE did not believe to be true and correct as to every material

matter, in that the return omitted approximately $400,411 in net fraudulently-obtained loan proceeds

DARVILLE received during 2008 from line 21 regarding "other income," or anywhere else on the

return, whereas, as DARVILLE knew and believed, his total income during 2008 included

approximately $400,411 in net fraudulently-obtained loan proceeds;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY-FOUR

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1(i) of Count One is incorporated here.

2.      Between approximately January 2005 and November 2008, PLUTA, under her former name JILL OTT, received approximately $997,253 as a straw borrower from approximately five fraudulent loans arranged by OTT from financial institutions. After making certain periodic payments on some of these fraudulent loans, PLUTA retained approximately $680,334 in net fraud proceeds, which funds PLUTA used for personal expenditures.

3.      Between approximately January 2005 and November 2008, PLUTA failed to report to the Internal Revenue Service the net fraudulent loan proceeds of approximately $680,334 she received and expended for her personal expenditures as income on her United States Individual Income Tax Returns (Form 1040 with schedules and attachments).

4.      On or about March 31, 2008, in the Northern District of Indiana, and elsewhere,

JILL A. PLUTA, aka JILL OTT,

defendant herein, did willfully make and subscribe a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2007, which return was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which return PLUTA did not believe to be true and correct as to every material matter, in that the return omitted approximately $85,291 in net fraudulently-obtained loan proceeds PLUTA received during 2007 from line 21 regarding "other income," or anywhere else on the return, whereas, as PLUTA knew and believed, her total income during 2007 included approximately $85,291 in net fraudulently-obtained loan proceeds;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY-FIVE

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1 through 3 of Count Thirty-Four are incorporated here.

2.      On or about March 23, 2009, in the Northern District of Indiana, and elsewhere,

JILL A. PLUTA, aka JILL OTT,

defendant herein, did willfully make and subscribe a United States Individual Income Tax Return

(Form 1040 with schedules and attachments) for the calendar year 2008, which return was verified

by a written declaration that it was made under the penalties of perjury and was filed with the Internal

Revenue Service, which return PLUTA did not believe to be true and correct as to every material

matter, in that the return omitted approximately $153,197 in net fraudulently-obtained loan proceeds

PLUTA received during 2008 from line 21 regarding "other income," or anywhere else on the return,

whereas, as PLUTA knew and believed, her total income during 2008 included approximately

$153,197 in net fraudulently-obtained loan proceeds;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY-SIX

THE SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1(j) of Count One is incorporated here.

2.      Between 2005 and 2007, QUICK did not receive a Form W-2 because she purposely did not advise ADP to issue her a Form W-2 for those tax years.

3.      Between approximately January 2005 and October 2008, QUICK was the straw borrower on at least seven fraudulent loans arranged by OTT from approximately six different financial institutions, the proceeds of which OTT caused to be deposited into the Emily, Inc. operating bank account at Grundy Bank and into the Valley Community Bank payroll account.

4.      Between approximately January 2005 and October 2008, QUICK wrote checks and directed electronic transfers from the fraudulent loan proceeds deposited into the Emily, Inc. bank accounts at Grundy Bank and Valley Community Bank in the amount of approximately $1,032,495, which QUICK used for personal purposes, including expenditures for her personal residence, automobiles for at least three of her children, college tuition for at least two of her children, and personal credit card payments totaling approximately $550,125.

5.      Between approximately January 2005 and October 2008, QUICK failed to report to the Internal Revenue Service the approximately $1,032,495 in net fraudulent loan proceeds she received and expended for personal purposes as income on her United States Individual Income Tax Returns (Form 1040 with schedules and attachments).

6.      From approximately January 1, 2007 and continuing through on or about April 15, 2008, in the Northern District of Illinois, Eastern Division,

JOAN M. QUICK,

defendant herein, did willfully attempt to evade and defeat the payment of income tax due and owing

by QUICK to the United States in the amount of approximately $108,132 for the calendar year 2007, by committing the following affirmative act among others:

      a.     During calendar year 2007, QUICK made personal credit card payments of approximately $217,398 from the Emily, Inc. bank accounts.

      b.     During calendar year 2007, QUICK made payments of approximately $131,780 on her personal residence from the Emily, Inc. bank accounts.

      c.     .During calendar year 2007, QUICK made car payments of approximately $16,000 for her childrens' automobiles from the Emily, Inc. bank accounts.

      d.     During calendar year 2007, QUICK purposely failed to obtain a Form W-2 from ADP showing the amount of her income from Emily, Inc.

      e.     QUICK failed to file a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the year 2007.

In violation of Title 26, United States Code, Section 7201.

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY